IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| **THOMAS ROBERTSON** | : | No. 2:20-cr-419 |
| | : | |

**MEMORANDUM OPINION**

**Goldberg, J.** February 28, 2023

Defendant Thomas Robertson, through standby counsel,[1] moves to dismiss the superseding indictment charging him with numerous financial fraud crimes. Defendant alleges that the postal inspector/lead agent in this case ("Inspector") engaged in improper law enforcement techniques that amounted to outrageous government misconduct. The Government responds that no misconduct occurred, and the defendant is simply "putting a nefarious spin on ordinary police work." Because I find that the defendant has not met the extremely high burden that governs dismissal of indictments based upon outrageous government misconduct, I will deny the motion.

**I.     Factual and Procedural Background**

On November 19, 2020, the defendant was indicted and charged with two counts of bank fraud, in violation of 18 U.S.C. § 1344 (counts 1 & 2) and two counts of false statements on loan applications, in violation of 18 U.S.C. § 1014 (counts 3 & 4) (ECF No. 1). On January 15, 2022, the grand jury returned a superseding indictment charging the defendant with bank fraud, in violation of 18 U.S.C. § 1344 (counts 1, 2 & 5); false statements on loan applications, in violation of 18 U.S.C. § 1014 (counts 3 & 4); mail fraud, in violation of 18 U.S.C. § 1341 (counts 6-9); and

---

[1] The defendant is representing himself *pro se*, with his third court-appointed lawyer acting as standby counsel. In a September 19, 2022 Opinion, I found that the defendant's dilatory and abusive conduct as it relates to the appointment of counsel process throughout this case constituted a waiver of his Sixth Amendment right to assistance of counsel. (See ECF No. 87).

1

aggravated identity theft, in violation of 18 U.S.C. § 1028A (counts 10-13). (ECF No. 43). The charges relate to two separate fraud schemes the defendant allegedly engaged in between approximately July 2018 and June 2019. The first scheme alleges that the defendant attempted to defraud multiple financial institutions by submitting loan applications that contained false information regarding his employment history and income. The second scheme alleges that the defendant operated a "credit-cleaning" business through which he submitted fabricated police reports to credit bureaus alleging identity theft in his customers' names in an attempt to improve their credit scores.

The defendant has been afforded multiple court-appointed lawyers, resulting in significant scheduling delays. Trial is scheduled to begin March 13, 2023.

In support of his motion, the defendant first notes that the Inspector was the lead investigator in a prior federal fraud prosecution wherein the defendant pled guilty to multiple counts of bank fraud and false statements on loan applications and was sentenced on July 25, 2011 to eight years' incarceration.[2] Defendant claims that the Inspector initiated the present investigation as part of a vindictive campaign to reincarcerate him because the Inspector was dissatisfied with the outcome of the previous case. Specifically, the defendant points to the following:

- In early January of 2019, the Inspector responded to a CrimeDex report[3] seeking leads on a suspect in a check fraud scheme in Spartanburg County, South Carolina. The CrimeDex report included a still photograph from surveillance video of the forgery suspect. The Inspector responded to the posting and indicated that the suspect in the photograph looked like the defendant. (Def. Br. p. 3–4, ECF No. 117).
- Over the following several months, the Inspector "heavily involved himself" in the South Carolina investigation, including preparing two photo lineups each depicting the defendant, and obtaining records from the other South Carolina suspects'

---

[2]  See USA v. Robertson, Dkt. No. 10-cr-757.
[3]  CrimeDex is a subscription service used by law enforcement to share and seek leads in criminal investigations. (Gov. Resp. n. 3, ECF No. 120).

- cellphones to search for any connections between them and the defendant. (Id. p. 4–5).
- The Inspector convinced an Assistant United States Attorney in this district to open a new grand jury investigation into the defendant based on the South Carolina charges. (Id. p. 5).
- In his testimony to the grand jury, the Inspector mischaracterized the source of the allegations against the defendant, stating that he "received information that [the defendant] was obtaining loans from various lenders and misrepresenting his income and duration of employment on those loan applications," when in fact he actively sought the defendant's credit reports and loan applications with no basis to believe any wrongdoing had occurred. (Id. p. 5–6).
- The Inspector made misrepresentations in two separate search warrant affidavits related to the present case. In a cell site search warrant, the Inspector mischaracterized the South Carolina forgery charges as "bank fraud" to better mirror the charges the defendant previously pled guilty to. In another search warrant affidavit, the Inspector stated in a footnote that the defendant had been "arrested and convicted in several states" since his release from prison in 2017, which was untrue. (Id. p. 6).
- The Inspector stated in an email to another law enforcement agent that it "really sucked" that the defendant was not convicted of an aggravated identify theft charge in the previous case he investigated. He went on to explain that the victim of the identity theft was a parole officer who worked for the City of Philadelphia, and the Inspector had to inform the victim that the government was unable to secure a conviction on that particular charge. (Id. p. 6–7).
- Rather than attempting to prevent the criminal activity he believed the defendant was engaging in, the Inspector instructed the defendant's probation officer to wait to file a violation of probation until the government had gathered enough evidence to support federal charges. (Id. p. 7).
- The South Carolina charges that were filed against the defendant were eventually dismissed, based in part on cell site evidence he produced of his actual location, several states away, at the time of the forgery. (Id. p. 7).

**II.   Legal Standard**

Criminal defendants may raise a due process challenge to an indictment based on the government's use of outrageous law enforcement investigative techniques. United States v. McLean, 85 F. Supp. 3d 825, 831–832 (E.D. Pa. 2015). "The pertinent question is whether the government's conduct was so outrageous or shocking that it amounted to a due process violation." United States v. Christie, 624 F.3d 558, 573 (3d Cir. 2010). The bar for relief based on an outrageous conduct defense is extremely high, and the burden is on the defendant to show "that

3

common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." United States v. Walters, 910 F.3d 11, 27 (2d Cir. 2018). "The judiciary is extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." United States v. Brennan, No. 19-cr-507, 2021 WL 2206308, at *2 (E.D. Pa. June 1, 2021) (quoting United States v. Voight, 89 F.3d 1050, 1065 (3d Cir. 1996)).

As far as I can tell, the Third Circuit has only ever found a due process violation based on this doctrine in one instance. See United States v. Twigg, 588 F.2d 373 (3d Cir. 1978). The facts in Twigg that necessitated dismissal are much different than those alleged by the defendant here.

In Twigg, a government informant, who was arrested for manufacturing methamphetamine, agreed to cooperate with the DEA to apprehend additional drug traffickers. Id. at 375. At the DEA's request, the informant contacted the defendant, a longtime friend, and suggested they set up a methamphetamine laboratory together. Id. While the defendant took responsibility for raising capital and arranging for the distribution of the drugs, the informant received considerable assistance from the government to carry out his part of the operation, including supplying a majority of the necessary supplies and resources. Id. The informant, with the DEA's assistance, was also completely in charge of the laboratory. Id. at 376.

The Twigg court found that "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law." Id. at 377. The court highlighted the fact that the criminal plan originated with the government, as the informant approached the defendant with a proposal to enter into a joint venture, rather than the other way around. Id. at 380. In doing so, the court found that "the government . . . sow[ed] the seeds of criminality and lure[d] the defendant into a conspiracy." Id. And once the government's plan got underway, the DEA gratuitously supplied a significant amount of the necessary materials,

including key ingredients that were difficult to obtain. Id. Because any assistance provided by the informant's co-defendant was minimal, the court found that the government's conduct in setting up, encouraging, and supplying the defendant with essential supplies and technical expertise amounted to "generat[ing] new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs." Id.

"No federal court has defined the requirements of the outrageous conduct defense with any degree of precision. Rather, the inquiry appears to revolve around the totality of the circumstances in any given case." United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992). The Third Circuit has, however, provided a set of factors to consider based on Twigg. McLean, 85 F. Supp. at 833. These factors include: (1) the temporal relationship between the infiltration of the crime for which the defendant is charged and the initiation of the government's involvement; (2) the fleeting nature or elusiveness of the crime; (3) whether the crime was conceived and contrived by government agents; and (4) whether the defendant was in control of the operations and had the means to commit the crime without government involvement. Id. at 833–836.

### III.   Discussion

The defendant maintains that the Inspector's actions, considered as a whole, amount to "vindictive and targeted harassment" against him. He argues the entire prosecution should be barred because the Inspector's conduct was so outrageous that it constituted an impermissible government overreach.

The government responds that the defendant falls far short of meeting the onerous standard for the outrageous conduct defense, as the factual circumstances before me bear no resemblance to the few cases in which the defense has been applied. Those cases, the government notes, all

involved entrapment, or coercive "sting" operations in which the government created new crimes seemingly for the very purpose of bringing charges against the defendants.  The government stresses that the outrageous conduct defense has never been recognized on facts similar to those alleged by the defendant here.

The government additionally asserts that there is no evidence that the Inspector's conduct came anywhere close to outrageous or shocking.  The defendant argues that the grand jury investigation in this case amounted to a fishing expedition, initiated primarily based on the Inspector's suspicions of wrongdoing that were unsupported.  But the government notes that before it opened its investigation in this case, a magistrate judge in South Carolina had approved forgery charges against the defendant.  (Gov. Resp. p. 4, Ex. E).  The government also learned the following day that the defendant had applied for a loan with a credit union while on supervised release without notifying his probation officer.  The investigation in this case was opened approximately two weeks after the government received these two pieces of information, both of which were strong indicia of potential wrongdoing and which constituted a good faith belief that the defendant was engaging in criminal activity.

The government additionally maintains that there is no evidence that the Inspector intentionally misidentified the defendant in the South Carolina case, and there is nothing unusual or improper about an agent assisting local police in other jurisdictions in investigating a felon he is familiar with.  The government also points out that it is completely appropriate for that agent to then confer with the felon's probation officer about suspected wrongdoing.  In sum, even if the defendants' allegations are all true, the government argues he is not entitled to relief.

After carefully considering the defendant's allegations, I find that the Inspector's conduct in this case does not rise to the necessary level of outrageousness to dismiss the indictment.

First, most of the Twigg factors outlined in McLean are not applicable and do not assist the defendant.  The government did not have any involvement in the current crimes the defendant is charged with committing.  There is no allegation that the defendant provided false information on loan applications at the direction of a government agent.  It is also not alleged that the defendant operated a credit-cleaning business as part of a larger government operation to apprehend co-conspirators or other potential criminals.  Here, the charges in the superseding indictment allege that the defendant was in complete control of his alleged fraud schemes, and the investigation did not, like Twigg, involve undercover assistance from government informants.

Nevertheless, the defendant accuses the Inspector of being motivated by malice rather than a desire to enforce the law, emphasizing that he "could have prevented [the defendant] from participating in any allegedly ongoing fraud," but he instead "chose to continue building evidence" against him. (Def. Br. p. 12).  The defendant notes that the Inspector told the defendant's probation officer not to issue an arrest warrant until he felt he had enough evidence to charge him federally. (See Def. Br., Ex. N).  The defendant concludes that the outrageous conduct defense was created to address situations like this, in which "law enforcement . . . use the power of the State to inflict harm rather than seek to prevent it."  (Id. p. 12).  But the defendant does not cite to any case law in which an indictment was dismissed under a similar theory, and in fact my review reflects that there is no such supporting precedent.  And second, the defendant's argument supports the government's position as to the first Twigg factor – as it demonstrates that an ongoing criminal enterprise existed before and without any assistance from the government.

And finally, I note that it is typical for law enforcement agents to provide investigative assistance to neighboring jurisdictions – in fact, the CrimeDex website seems to have been created for this very purpose.  At the time the government initiated the grand jury investigation that led to

7

the charges in this case, it had ample information to suggest the defendant was committing crimes and, thus, the decision to move forward with the investigation was reasonable. While the Inspector's comments about the prior case may have been ill-advised, they are not sufficient evidence of any improper motive.

In short, the government's conduct in investigating the defendant in this case was not outrageous and the defendant is not entitled to the extraordinary relief he seeks. An appropriate order follows.